# Richmond

## THOMAS M. ANDREWS V. CHESAPEAKE AND OHIO RAILWAY COMPANY, A CORPORATION.

March 4, 1946.

Record No. 3018.

Present, All the Justices.

The opinion states the case.

*Minter & Minter*, for the plaintiff in error.

*J. M. Perry*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Thomas M. Andrews instituted this action by notice of motion to recover damages for personal injuries alleged to have been inflicted upon him by negligence of the defendant,

the Chesapeake and Ohio Railway Company. The notice of motion was amended to show that it was prosecuted also for the benefit of the plaintiff's employer, the West Virginia Pulp & Paper Company, a corporation, as its interest might appear, and the case proceeded to trial on a plea of not guilty.

After the evidence of both parties had been heard in full, the trial court struck the evidence, holding that while it failed to show any negligence on the defendant's part, plaintiff's own testimony disclosed that he was guilty of contributory negligence as a matter of law. Notwithstanding an instruction in accordance with this holding, the jury returned a verdict for the plaintiff in the sum of $5,000. The verdict was thereupon set aside and judgment entered for the defendant.

The evidence may be summarized as follows:

Andrews was employed by the West Virginia Pulp & Paper Company, at Covington, Virginia, as a common laborer. On December 31, 1943, the date of his injuries, he was engaged with three other men, Jesse Kimberlin, Ernest Brown and Everett Hubbard, in unloading bulk salt from a railroad car of the defendant to the salt storage house of his employer. The salt was removed in wheelbarrows from car to salt house across a steel plate laid as a gangplank between the door of the car and the front of the shed. The car was standing on the tracks by the side of the salt house, its open door being even with the door of the salt house. There was no outer platform to the salt house, the floor of the latter being flush with the floor of the former. The salt house was twenty-five to thirty feet long and about fifteen feet wide. The clearance between the side of the car and the side of the house was about ten or twelve inches.

On the day in question, between one-thirty and two p. m., while Andrews and his companions were engaged in their duties, the defendant's yard crew, a conductor and three brakemen brought a train of loaded cars to the paper company's mill for delivery to the paper company on tracks in its mill yard. Ten of these cars were to be placed on

track 8, a spur track which runs east and west, and is entered from the east. The car being unloaded was on this track, the salt house being on the south side of the track. A number of empty cars stood also on this track west of this car, and all cars on track 8 had to be switched out before the new cars could be brought in and placed for unloading.

Before bringing his train into track 8, conductor Sneed, of the yard crew, notified Andrews and the men at work with him in the salt car that the yard crew were coming in to do the switching. The plaintiff and the men working with him immediately left the car they were unloading, pulled back the gangplank, and retired to the salt shed to await the completion of the switching. The yard crew switched the salt car and the empties from track 8, set aside the empties, and then pushed back on to track 8 a train of about fifteen cars, ten of which, ahead of the salt car, were for points west of the salt house, the eleventh being the partly unloaded salt car, and the remaining cars between that and the engine being intended for other tracks. After placing the new cars west of the salt house, the train pulled east with the partly unloaded car, on top of which, Bernard McFadden, a conductor working as a brakeman, rode. McFadden rode on the top of this car so that he could see one of the men in the salt shed, from whom he could get a signal when the car arrived at the proper place for unloading, and he, in turn, could give a stop signal to the engineer.

Andrews was standing in the door of the shed, and when the car ridden by McFadden came opposite the salt house, so that its door was opposite the salt shed door, he notified McFadden that the car was in a position for unloading. McFadden signaled the engineer and the car was immediately stopped. McFadden walked easterly along the top of the salt car, stepped to the next car, descended its ladder to the north side, the side of the train away from the salt house, and proceeded to attempt to uncouple the car.

The car had an automatic coupling attachment. By pressing a lever down, the coupling pin is raised an inch or

two inside the coupling block so as to rest on a little shoulder.

McFadden said he pushed the lever down and it lifted the coupling pin up. He then chocked the easterly wheel of the salt car with a stick, because of a slight downgrade, and signaled the engineer to pull off eastwardly. Just as the train started, he saw the coupling pin drop back in place and hold the cars together, so that the "spotted" salt car was moved with the remainder of the train. He signaled the engineer, and the train was stopped before it had moved more than six or eight feet. The salt car was then "re-spotted," McFadden pressed the lift lever of the coupling, it uncoupled the cars, and the remainder of the train moved out of the switch track. None of the train crew knew of any injury to Andrews until a later time.

McFadden said that it only took him one minute to get down from the top of the car, press the lever to release the coupling pin, put the chock under the wheel, and wave the engineer ahead, and that if a man took five minutes to do this, "there would have to be something wrong with him, crippled or something."

Questioned about the operation of the automatic coupling, McFadden said that sometimes the coupling pin will catch on the shoulder in the attachment provided for it, sometimes it will not; and at other times the lift lever must be held down to keep it up. He further said that sometimes "Even if the pin is up, I have known them not to be uncoupled." He did not know what caused the pin to drop on this occasion, because if it rests on the shoulder, it takes "right much shaking to cause it to drop back."

After the car had first been properly placed to complete the unloading, Andrews went to the far side of the storage shed and wrote down the names and the time of labor of each man working there with him on that day. One of the men smoked a cigarette, and another purchased and drank a bottle of Coca-Cola before any of them returned to their work. They said that they thus waited from three to five minutes after the car was first "spotted" before resuming

work. At the expiration of that time, Andrews suggested that they go back to work. He and Kimberlin then put hooks to either side of the gangplank to slide it forward into the door of the car. Kimberlin got his end of the plank into the car door. At that moment, the car made the forward movement above described, and violently pushed the plank aside. The steel plank caught the plaintiff's right foot against the salt shed severely crushing, bruising and permanently injuring it.

There was some question whether the men in the storage shed could observe the train or the train crew at work, except while immediately in front of the shed. The brakeman of the train worked on its north side because of the cramped space between the south side of the train and the shed. The plaintiff made no special effort to ascertain whether the salt car had been detached from the train. The evidence does not disclose whether it was the custom of the railroad to give notice to that effect to men engaged in unloading cars which are involved in switching operations.

The holding of the trial court that the defendant was free from negligence and that the plaintiff was guilty of contributory negligence is a solecism. Contributory negligence on the part of the person injured always implies negligence on the part of the person causing the injury. There is nothing to which the negligence of the plaintiff can contribute unless the negligence of the defendant be first established. The distinction between negligence of the plaintiff and negligence of the defendant differs only in name.

Negligence is usually a mixed question of law and fact. Where the facts are undisputed and lead only to one conclusion, the question is one of law for the court. Where the facts or inferences fairly drawn from them are in dispute or where fair-minded men may honestly differ, the question is not one of law, but of fact to be determined by a jury, under proper instructions from the court.

In view of the conclusion which we have reached, we refrain from expressing any opinion on the weight and value

of the evidence in this case, in part or as a whole. However, it may be said that the failure to separate the unloaded car from the remainder of the train before it pulled away, was an efficient cause of the accident, regardless of the disputed fact that the plaintiff took one minute or five minutes to return to his uncompleted duties after the car had been "spotted" at the proper place for the resumption of such duties.

Whether the failure to uncouple was due to the negligence of defendant's agents, or whether McFadden, under the circumstances known to him, exercised ordinary and reasonable care in attempting to uncouple the salt car from the train, and whether he took one minute, as a capable brakeman, to properly do all that he did, or actually took three to five times the amount of time which should have been required, were questions of fact. Whether the plaintiff, in view of the circumstances, exercised due and ordinary care and caution for his own safety before returning to his work, was likewise a question of fact.

The trial judge should not have deprived the jury of their peculiar province to determine the foregoing questions, or any other questions of material fact.

The judgment of the trial court is, therefore, reversed and the case remanded for a new trial.

*Reversed.*

HOLT, J., dissenting.

The plaintiff, Mr. Andrews, was guilty of negligence which contributed to his accident. That phase of this case is forcefully expressed by the trial court, which said:

"It stands out like a sore finger that the plaintiff was guilty of contributory negligence as a matter of law."

From which it follows that he should not recover, whether the Railway be guilty or blameless.

HUDGINS, J., concurs in this dissent.